# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **Catholic Medical Association**, on behalf of itself and its members, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. _____ |
| **United States Department of Health and Human Services**; **Xavier Becerra**, in his official capacity as Secretary of the United States Department of Health and Human Services; **Centers for Medicare & Medicaid Services** of the United States Department of Health and Human Services; and **Chiquita Brooks-LaSure**, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services, | § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## COMPLAINT

1.     This case challenges a July 2022 Memorandum[1] and accompanying Letter[2] from Defendants the Centers for Medicare & Medicaid Services (CMS) of the

---

[1] Attached as Exhibit A, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, Centers for Medicare and Medicaid Services (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf.

[2] Attached as Exhibit B, *Letter to Health Care Providers*, Secretary of HHS Xavier Becerra (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

Case 3:25-cv-00048    Document 1    Filed 01/10/25    Page 1 of 28 PageID #: 1

United States Department of Health and Human Services (HHS), and HHS Secretary Xavier Becerra, respectively, which require hospitals and doctors to perform abortions, and purport to be authorized by the 1986 law the Emergency Medical Treatment and Labor Act (EMTALA).

2.     The Memorandum and Letter (together, the "Mandate") exceed Defendants' statutory authority, were promulgated without procedure required by law, and are arbitrary and capricious, all in violation of the Administrative Procedure Act (APA). The Mandate also violates the rights of doctors under the Religious Freedom Restoration Act (RFRA) and the First Amendment.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

4.     This Court has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

5.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

6.     The APA waives sovereign immunity and provides jurisdiction and a cause of action to review Defendants' actions and enter appropriate relief. 5 U.S.C. §§ 553, 701–06.

7.     This Court has equitable jurisdiction and remedial power to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

8.     This case seeks declaratory, injunctive, and other appropriate relief under the APA, 5 U.S.C. §§ 701–06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; and Federal Rules of Civil Procedure 57 and 65.

9.     This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988(b).

10.     Venue is proper in this Court and this division under 28 U.S.C. § 1391, including paragraph (e).

11.     A substantial part of the events or omissions giving rise to the claims occurred in this district and this division. The case in substantial part concerns Defendants' regulation of Plaintiff's members in this district and division.

12.     Plaintiff Catholic Medical Association has members who reside and are regulated in this district, including Dr. Rachel Kaiser, M.D., identified below. No real property interest is involved in this action.

13.     Defendants are agencies of the United States and officers and employees of the United States or of any of its agencies acting in their official capacity or under color of legal authority.

## PARTIES

*Plaintiff*

14.     Plaintiff Catholic Medical Association is a national, physician-led community that includes as members about 2500 physicians and healthcare providers nationwide in all fields of practice. CMA represents faithful Catholics in the healthcare field so that its members can grow in faith, maintain ethical integrity, and provide excellent healthcare in accordance with the teachings of the Catholic Church. CMA members oppose direct[3] abortion and categorically exclude providing medical interventions or referrals for direct abortion, including

---

[3] A "direct abortion" in the view of CMA is the directly intended termination of pregnancy, from fertilization but before viability, or the directly intended destruction of a living embryo or fetus. This does not include interventions that have as their direct purpose the cure of a proportionately serious pathological condition of the reproductive system which cannot be postponed until viability, as long as such interventions do not constitute a direct attack on the unborn child.

Case 3:25-cv-00048    Document 1    Filed 01/10/25    Page 3 of 28 PageID #: 3

completing an incomplete chemical abortion. CMA is a nonprofit organization incorporated in Virginia, and its registered agent is in Virginia. CMA's principal place of business is in Pennsylvania. CMA sues on behalf of its members, including its identified member Dr. Rachel Kaiser in Nashville, Tennessee.

### Defendants

15.     Defendant United States Department of Health and Human Services is a cabinet-level agency of the United States government and enforces EMTALA. HHS's address is 200 Independence Avenue SW, Washington, DC 20201.

16.     Defendant Xavier Becerra is the Secretary of HHS and issued the Letter challenged here (Ex. B). He is sued in his official capacity. His address is 200 Independence Avenue SW, Washington, DC 20201.

17.     Defendant Centers for Medicaid and Medicare Services (CMS) is the division of HHS that administers the Medicaid and Medicare programs and issued the Memorandum challenged here (Ex. A). CMS's address is 7500 Security Boulevard, Baltimore, Maryland 21244.

18.     Defendant Chiquita Brooks-LaSure is Administrator of CMS, which issued the Memorandum challenged here. Ms. Brooks-LaSure is sued in her official capacity. Her address is 7500 Security Boulevard, Baltimore, Maryland 21244.

## BACKGROUND

### I.     EMTALA

19.     Congress enacted EMTALA to prevent "patient dumping," which is the practice of refusing to treat patients who are unable to pay.

20.     EMTALA requires that every Medicare-participating hospital provide medical screening and stabilizing treatment for emergency medical conditions regardless of a patient's ability to pay. 42 U.S.C. § 1395dd.

21.     EMTALA defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily function or part." 42 U.S.C. § 1395dd (e)(1)(A).

22.     "To stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

23.     The Social Security Act, of which EMTALA is a part, states that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … or to exercise any supervision or control over the administration or operation of any … institution, agency, or person [providing health services]." 42 U.S.C. § 1395.

24.     EMTALA does not operate as federal oversight on the practice of medicine and does not create or authorize the creation of a national standard of care.

25.     Instead, the standard of medical care is determined by the state and the community in which the treatment took place.

26.     State laws regulating abortion, and state laws protecting conscientious objections to abortion, form an essential part of the standard of medical care and of the state's regulation of the practice of medicine.

27.     With one notable exception, EMTALA, while requiring that stabilizing "medical treatment of the condition as may be necessary to assure … that no

material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility," does not mandate, direct, approve, or even suggest the provision of any specific treatment. 42 U.S.C. § 1395dd(e)(3)(A). That exception—"with respect to a pregnant woman who is having contractions" (i.e., in labor), and where "there is inadequate time to effect a safe transfer to another hospital before delivery, or … that transfer may pose a threat to the health or safety of the woman or the unborn child"—requires covered entities to "stabilize" meaning "to deliver (including the placenta)." 42 U.S.C. § 1395dd(e)(1)(B) & (e)(3)(A).

28.     EMTALA also includes an anti-preemption provision. Congress specified that EMTALA "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of [EMTALA]." 42 U.S.C. § 1395dd(f).

29.     No federal statute or constitutional provision confers a right to abortion.

30.     EMTALA says nothing about abortion and does not guarantee access to abortion.

31.     Instead, EMTALA requires the stabilization of emergency medical conditions posing serious jeopardy to patients, including the "unborn child," and explicitly refers to the need to protect the "unborn child" four times. *See* 42 U.S.C. § 1395dd(c), (e).

32.     Abortion does not stabilize the unborn child from serious jeopardy faced by an emergency medical condition, nor does it preserve the life or health of an unborn child.

33.     EMTALA provides for civil enforcement actions against both hospitals and physicians. 42 U.S.C. § 1395dd(d). Hospitals and physicians are each subject to a civil penalty of up to $119,942 for each violation. Ex. A at 5. They may also be

6

excluded from participating in Medicare and other federal funding programs if they violate EMTALA.

## II.     HHS issues an abortion Mandate under EMTALA

34.     On June 24, 2022, the Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). The Court held that, contrary to the holdings of *Roe* and *Casey*, "the Constitution does not confer a right to abortion," *id.* at 292, nor does it "prohibit the citizens of each State from regulating or prohibiting abortion," *id.* at 302.

35.     That same day, President Biden held a press conference declaring that "[t]he only way we can secure a woman's right to choose … is for Congress to restore the protections of *Roe v. Wade* as federal law."[4]

36.     The next day, Secretary Becerra stated in an interview that Americans "can no longer trust" the Supreme Court.[5] When asked what he was doing in response to *Dobbs*, Secretary Becerra responded, "we're going to be aggressive and go all the way."[6]

37.     The Mandate purports to override individual states' abortion laws under the authority of EMTALA.

_____

[4] *Remarks by President Biden on the Supreme Court Decision to Overturn* Roe v. Wade, The White House (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/.

[5] *HHS Secretary Becerra Talks Women's Future with Abortion Following* Roe v. Wade *Decision* (NBC News broadcast June 25, 2022), https://www.nbcnews.com/video/women-s-future-with-abortion-implementing-harm-reduction-with-addiction-142836293922, at 1:45.

[6] *Id.* at 2:19, 2:59.

38.     The Mandate was implemented through CMS, which issued the Memorandum to all State Survey Agency Directors (the officials who implement Medicare and Medicaid). *See* Ex. A.

39.     At the same time, Secretary Becerra issued the Letter to all Medicare-participating Health Care Providers describing the Memorandum. Ex. B.

40.     HHS and CMS did not provide notice and opportunity for public comment before issuing the Mandate.

41.     In the Mandate, the agency purports to remind hospitals of their existing obligations under federal law. But the Mandate did not "remind" hospitals of anything; rather, it creates new requirements related to the provision of abortions—requirements that are found nowhere in EMTALA, any other federal law, or any past regulation or guidance enforcing EMTALA.

42.     The Mandate requires that covered entities perform an abortion if "abortion is the stabilizing treatment necessary to resolve [an emergency medical condition]." Ex. A at 1.

43.     This requirement has never been a part of EMTALA.

44.     EMTALA does not mention abortion, require particular medical treatments, or set a nationwide standard of care. The only specific stabilizing treatment it mentions is delivery of the unborn child when a mother is in labor.

45.     The Mandate omits the duty under EMTALA to stabilize the unborn child.

46.     The Mandate states, "**[i]f a physician believes that a pregnant patient** presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician ***must*** provide that treatment." Ex. A at 1.

47.     It then says that "[w]hen a state law prohibits abortion and does not include an exception for the life of the pregnant person—or draws the exception more narrowly than EMTALA's emergency medical condition definition—**that state law is preempted**." Ex. A at 1.

48.     CMS also says the Mandate's preemption "could be enforced by individual physicians in a variety of ways, potentially including as a defense to a state enforcement action, in a federal suit seeking to enjoin threatened enforcement, or … under the statute's retaliation provision." Ex. A at 5.

49.     This preemption has never been a part of EMTALA and contradicts 42 U.S.C. § 395dd(f).

50.     As Spending Clause legislation, EMTALA cannot preempt state law.

51.     Even if Spending Clause legislation could preempt state law, it cannot do so here where third parties—and not the state—agree to the funding condition.

52.     The Hyde Amendment generally prohibits hospitals from using federal funds to pay for abortions. Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. H, tit. V, §§ 506–07, 138 Stat. 460, 703.

53.     The Weldon Amendment prevents the Department of Health and Human Services (HHS) from using federal funds to require a healthcare entity to facilitate abortion. *Id.* § 507(d)(1), 138 Stat. at 703.

54.     Despite this prohibition, the Mandate wrongly requires abortion in hospitals receiving federal funds.

55.     Many CMA members work at hospitals that are not run by a state, and there is no Spending Clause authority to preempt the application of a state law in private hospitals by virtue of those hospitals' receipt of Medicare funds.

56.     The health conditions for which the Memorandum purports to require abortions are broader than the life of the mother exceptions found in state laws attempting to respect the life and wellbeing of the unborn child. For example, the

9

Mandate says it includes undefined "health" conditions of a pregnant woman, situations such as "incomplete medical abortion[s]," and situations that do not presently threaten the life of the mother but are "likely … to become emergent." Ex. A at 1, 3, 6.

57.     The Mandate specifies that "an emergency medical condition that has not been stabilized" can include "a patient with an incomplete medical abortion," and that the sorts of abortion that EMTALA can require include "methotrexate therapy" or "dilation and curettage." Ex. A at 4, 6.

58.     Thus, the Mandate seeks to force hospitals and physicians to "complete" medication abortions even where the pregnancy is not itself endangering a woman's life or health, and even if the abortion began elsewhere, even illegally.

59.     The Mandate, by threatening to punish hospitals and physicians for choosing not to engage in abortion as a method to stabilize patients, threatens to second-guess the medical judgment or moral or religious beliefs of a hospital or physician, and to subject the hospital or physician to penalties after the fact for allegedly failing in their stabilization duty based on the new abortion standard of care set out in the Memorandum.

60.     The risk of after-the-fact liability is not hypothetical. It is how EMTALA is enforced by HHS.

61.     For instance, a physician or hospital could decline to complete a medication abortion, proposing instead to attempt to stabilize both the mother and the unborn child by administering progesterone. However, the refusing physician or hospital may be accused by CMS and its agents of violating the Mandate, triggering potential liability by CMS and HHS's Office of the Inspector General.

62.     No federal statute, including EMTALA, supersedes or preempts the States' power to prohibit abortion.

### III. State medical licensing requirements are not in direct conflict with any requirement of EMTALA. The Mandate conflicts with state laws protecting women and unborn children from the harms of abortion.

63. Abortion is unlawful and a criminal offense in many states and situations, including in Tennessee, which defines abortion as "the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant with intent other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, to terminate an ectopic or molar pregnancy, or to remove a dead fetus." *See* Tenn. Code Ann. § 39-15-213(a)(1), (b) (Apr. 28, 2023).

64. Physicians' licenses to practice medicine in these states do not authorize them to perform illegal abortions. They may lose their medical licenses if they violate the law in their practice of medicine.

65. No state prohibits treatment of an ectopic pregnancy or management of a miscarriage (that is, a spontaneous abortion) under its pro-life laws restricting abortion.

66. All 50 states allow abortion when necessary to save the life of the mother. In states that restrict abortion, like Tennessee, there is an exception for procedures necessary to save the life of the mother or prevent serious injury to the mother. *E.g.*, Tenn Code Ann. § 39-15-213(c)(1)(A). Consistent with natural moral law and the teachings of the Catholic Church, as embraced by the Catholic Medical Association, no direct abortion, as defined in footnote 3, is justified even in such situations. Every effort is to be made to save the lives of the mother and unborn child. It is CMA's position that this can be accomplished, and if not, it may be possible to invoke the principle of double effect in situations identified by the *Ethical and Religious Directives for Catholic Health Care Services*: "Operations, treatments, and medications that have as their direct purpose the cure of a

proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child."[7]

67.     Many states, including Tennessee, specify that the provision allowing abortion to save the life of or prevent serious injury to the mother cannot be invoked "based upon a claim or a diagnosis that the pregnant woman will engage in conduct that would result in her death or the substantial and irreversible impairment of a major bodily function or for any reason relating to the pregnant woman's mental health." Tenn. Code Ann. § 39-15-213(c)(2).

## IV.     Judicial review is proper.

### A.     The Mandate is final agency action.

68.     The Mandate is final agency action subject to judicial review under the APA.

69.     The Mandate reflects the culmination of the agency's decisionmaking process.

70.     The Memorandum has an immediate effective date. Ex. A at 6.

71.     The Mandate states that it creates a safe harbor for those who violate state law under its cover. *E.g.*, Ex. A at 5.

72.     The Mandate sets out the agency's legal position on the meaning of EMTALA—in particular, how EMTALA applies after *Dobbs* and its relationship to conscience protections and RFRA—and binds the agency's personnel to its analytical method.

---

[7] U.S. Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* #47 (6th ed. 2018), https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_3.pdf.

73.     The Mandate takes the legal position that EMTALA's stabilization requirement preempts state laws prohibiting abortion by claiming such laws are in "direct conflict" with EMTALA. *E.g.*, Ex. A at 4.

74.     The Mandate takes the legal position that EMTALA does not include a duty to stabilize the unborn child. Ex. A at 3 (omitting reference to an unborn child from its statement of the law).

75.     The Mandate takes the legal position that any conflict between stabilizing the mother and stabilizing the unborn child must be resolved through abortion. Ex. B. at 1. It states, "if a physician believes that a pregnant patient … is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment." Ex. B. at 1.

76.     The Mandate takes the legal position that EMTALA's stabilization requirement is triggered if a medical condition is "likely … to become emergent." Ex A at 1.

77.     The agency commits itself to these legal positions. For example, the Letter promises that HHS "will take every action within our authority" to enforce the Memorandum, Ex. B. at 2.

78.     These legal positions go beyond EMTALA.

79.     The Mandate says nothing about the Mandate not being applicable when other laws protecting conscience or religious freedom would apply.

80.     CMS has never modified the Mandate to clarify that it does not apply where conscience or religious freedom laws apply.

81.     The Mandate is binding on HHS, CMS, and their officials.

82.     Under the Mandate, HHS and CMS officials enforcing EMTALA are not free to reach conclusions opposite to the positions taken in the Mandate.

**B.    The Mandate threatens CMA members as regulated parties.**

83.    CMA is a national, physician-led community that includes about 2500 physicians and health professionals nationwide in all fields of practice. For its members, healthcare is not just a job but a sacred calling. CMA members care for all people without discrimination on the basis of sex or any other characteristic prohibited by law. A patient with medical needs, such as a sore throat, broken arm, HIV, miscarriage, or cancer, should be given the best care possible, regardless of the patient's identity.

84.    CMA's mission is to represent faithful Catholics in the healthcare field so that its members can grow in faith, maintain ethical integrity, and provide excellent healthcare in accordance with the best medical standards of care and the teachings of the Catholic Church.

85.    CMA members seek to be a voice of truth spoken in charity, defending the dignity of human life and showing how Catholic teachings on the human person improve the practice of medicine. CMA is a leading national voice on applying the principles of the Catholic faith to medicine. It publishes guidance on healthcare ethics, creates educational resources and events, and develops strategies for members to provide healthcare consistent with Catholic values. CMA advocates and litigates for members' freedoms.

86.    CMA seeks relief from the Memorandum and Letter on behalf of its current and future members. Seeking such relief for all aspects of their practices is part of the mission of CMA as approved by its board of directors.

87.    CMA is a nonprofit organization. CMA members join CMA voluntarily, help finance CMA activities with dues and donations, help elect CMA leaders, and serve in CMA leadership.

88.    CMA's board of directors has eleven medical doctors, a chaplain who is also a medical doctor, a doctoral prepared registered nurse with an advanced degree

in maternal-child health and a pontifical license in the Canon Law of the Catholic Church, and a Catholic bishop who holds a doctorate of divinity.

89. CMA has local guilds (chapters) covering every region of the country and the military. CMA has two active Guilds in Tennessee: the Nashville Guild of the CMA and the St. Gianna Guild of Knoxville. Each guild has multiple physician members.

90. CMA members mainly are physicians. CMA tracks each member's years in practice as well as whether the member has retired from practice.

91. CMA members have deep, substantial, science-based and religious objections to abortions. Members hold the categorical view that direct abortions harm women, are fatal to unborn children, and are unethical. CMA and its members believe that the direct intentional killing of the unborn child through abortion is a grave evil, and that facilitating, referring for, or speaking in favor of that practice is impermissible.

92. CMA believes: "Abortion is not healthcare. As physicians and other healthcare professionals, we know that when we care for pregnant women, we are caring for two distinct patients. Our duty is to protect and preserve the lives of the patients whom we care for…. From the time the original Hippocratic Oath was introduced, there has been a clear separation of medical care from the intentional killing of human beings. The science is clear—at the moment of fertilization, a new distinct, living and whole human being comes into existence. Abortion, which is an action whose sole intent is to end this life, clearly violates the basic tenets of medical ethics."[8]

---

[8] CMA, (Nov. 2, 2021), https://www.cathmed.org/blog/2021/11/02/abortion-is-not-healthcare-a-message-from-the-alliance-for-hippocratic-medicine/.

93.     CMA members' opposition to abortion is informed by their religious beliefs. The Catechism of the Catholic Church states: "Since the first century the Church has affirmed the moral evil of every procured abortion. This teaching has not changed and remains unchangeable. Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law."[9]

94.     As Pope Francis has said, "Reason alone is sufficient to recognize the inviolable value of each single human life, but if we also look at the issue from the standpoint of faith, every violation of the personal dignity of the human being … is an offense against the Creator…. Unborn children [are] the most defenseless and innocent among us."[10]

95.     CMA has resolved that it will "advocate for protection of pre-born babies, condemn any abortion, and … affirm with clarity the value of human life" and that it "supports the current Federal law which protects the physician from being coerced into referring for abortion."[11]

96.     CMA Members' categorical exclusion of providing, facilitating, or affirming direct abortions, and commitment to state laws restricting certain abortions, precludes members from performing those abortions, helping complete those abortions, or referring for the abortions.

97.     Providing, facilitating, referring for, or endorsing direct abortion violates the core religious beliefs of CMA members and their oaths to "do no harm."

---

[9] Catechism of the Catholic Church ¶ 2271, https://www.vatican.va/archive/ENG0015/__P7Z.HTM.

[10] Pope Francis, Apostolic Exhortation Evangelii Gaudium ¶ 213 (Nov. 24, 2013), https://www.vatican.va/content/dam/francesco/pdf/apost_exhortations/documents/papa-francesco_esortazione-ap_20131124_evangelii-gaudium_en.pdf.

[11] CMA, *Resolutions*, https://www.cathmed.org/resolutions.

16

98.     The Mandate injures CMA members. Many CMA members work in hospitals subject to EMTALA and provide care in their emergency rooms to women in pregnancy-related situations.

99.     The Mandate exerts government pressure on CMA members to violate those beliefs and makes it more difficult for the members to practice medicine according to their faith.

100.    CMA has individual physician members, including in the Middle District of Tennessee, who actively practice medicine, who participate in HHS-funded federal healthcare programs, and who are subject to and affected by the Mandate, including one or more affected members in the Nashville division.

101.    Dr. Rachel T. Kaiser of Nashville, Tennessee, is a member in good standing of CMA. She shares CMA's positions. Dr. Kaiser is representative of and similarly situated to CMA's members as a whole.

102.    Dr. Kaiser is an emergency room (ER) doctor who sees Medicaid, Medicare, and CHIP patients on a contract basis at Ascension St. Thomas West Hospital in Nashville, Tennessee.

103.    Dr. Kaiser considers both a pregnant woman and her unborn child to be human persons and her patients, and believes both are entitled to medical care and deserve the protection of the law. She wants to remain free to practice medicine according to her conscience and religious beliefs.

104.    Dr. Kaiser routinely provides referrals to an OB/GYN for prenatal care and for miscarriage treatment after fetal demise has occurred. She often counsels pregnant ER patients in ways that affirm the value of unborn life. She refers patients to a local pregnancy care center—she does not refer for abortions.

105.    At least once a year, ER patients ask Dr. Kaiser for an abortion or for another procedure that could end the life of an unborn child. At times, ER patients also ask for abortion referrals. Dr. Kaiser does not provide these procedures or

referrals. She expects she will continue to receive similar requests for abortions or abortion referrals, which she will continue to decline.

106.    Dr. Kaiser will not perform, refer for, or participate in elective abortions. If a pregnant woman presented to the ER after an attempted chemical abortion and her unborn child was still living, Dr. Kaiser would stabilize the mother, if necessary, and also offer intervention to try to save the unborn child's life. She would offer to prescribe progesterone for mothers who want to try to counter the effects of mifepristone and save their unborn children. But Dr. Kaiser is afraid she would be violating the CMS memorandum's interpretation of EMTALA if she declined to complete an incomplete medication abortion where the child is still living.

107.    In her practice as an ER physician, Dr. Kaiser complies with Tennessee's laws protecting unborn children and she intends to continue to do so. She will not perform, participate in, or refer for any unlawful abortion. If the Mandate requires her to perform, participate in, or refer for unlawful abortions or elective abortions, Dr. Kaiser might be forced to give up her medical practice.

108.    The Memorandum and Letter have been enjoined as to the plaintiffs in *Texas v. Becerra*: the State of Texas, and members of the American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG) and the Christian Medical & Dental Associations (CMDA). *See* 89 F.4th 529 (5th Cir. 2024), *cert. denied* No. 23-1076, 2024 WL 4426546 (U.S. Oct. 7, 2024).

109.    Many of CMA's members are not protected by the *Texas v. Becerra* judgment, because they are not members of AAPLOG or CMDA, and they practice medicine outside of Texas.

110.    Dr. Kaiser is not a member of AAPLOG or CMDA, and practices medicine outside of Texas.

111. These CMA members need a court order protecting them from the Mandate.

112. Other than acknowledging the injunction from *Texas v. Becerra* that does not encompass the CMA's members, Defendants have never modified or withdrawn the Mandate, either in whole or in part. *See* Ex. A.

113. The Mandate is still in force at the time this case is filed.

114. The Mandate impacts CMA's members as individual physicians who are regulated by HHS, including CMS.

115. If CMA members were to comply with the Mandate's interpretation of EMTALA, they would lose their professional and personal integrity and reputation of practicing with sound judgment and good medical ethics, making patients less likely to trust them, and driving patients and employees away from their practices.

116. If CMA's members do not comply with the Mandate's interpretation of EMTALA, they will be violating a federal regulatory dictate, and will be subject to investigations and enforcement actions, losing time, money, and resources that they could use for medical care, as well as putting their jobs and medical licenses at risk.

117. The Mandate's looming threat of government penalties burdens the free exercise of religion of CMA's members. The decisions they make in emergency room settings can be sensitive, complex, rushed, and time-limited. They make their utmost effort to protect all of their patients, including the unborn, based on their medical, ethical, and conscientious judgments. Injecting government pressure to assist or complete abortions into those delicate situations necessarily burdens the medical, ethical, and religious decision-making that CMA's members engage in while in emergency room settings.

118. CMA members have a religious objection to being used as a link in the abortion-product chain. Yet this is exactly what happens when, for example, abortion drugs are mailed to women in pro-life states or prescribed to them in

nearby states—women take them at home instead of in a medical office, and prescribers, pharmaceutical companies, HHS, and other federal agencies tell those women to go their local emergency room if there are complications. HHS through the Mandate insists that CMA's member doctors and their Medicare-participating hospitals must assist or complete such chemical abortions, rather than allowing the physician to engage in scientifically defensible treatments to address the wellbeing of both the mother and unborn child.

119. The Mandate will drive members of CMA out of the medical profession, and it will dissuade CMA medical students from choosing to practice emergency medicine, narrowing their career options and reducing care for underserved, low-income, and rural patients.

120. The Mandate imposes irreparable harm on CMA's members.

121. CMA and its members have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act: Contrary to Law
### 5 U.S.C. § 706(2)(A)–(C)

122. Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1–121 of this complaint.

123. The Court shall hold unlawful and set aside agency action undertaken: not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; short of statutory right; or contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(A)–(C).

124. EMTALA does not authorize the Mandate.

125. EMTALA nowhere allows Defendants to require abortions or to establish a nationwide standard of care requiring abortions.

126.  Instead, in EMTALA Congress denied Defendants authority to mandate abortions by requiring that the "unborn child" be stabilized.

127.  Defendants do not have statutory authority to exercise "any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395.

128.  EMTALA does not preempt state law, and as conditional spending legislation it cannot preempt state law.

129.  There is no abortion mandate clear in the text of the EMTALA mandate to satisfy the requirement for imposing Spending Clause conditions.

130.  EMTALA "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of [EMTALA]." 42 U.S.C. § 1395dd(f).

131.  State laws regulating the practice of medicine by prohibiting abortion or limiting the scope of licensed medical practice to lawful conduct are not in "direct" conflict with EMTALA's stabilization requirement or any other requirement in EMTALA.

132.  Tennessee law restricting abortion does not directly conflict with any requirement of EMTALA.

133.  EMTALA's stabilization requirement encompasses medical treatments that are "available." 42 U.S.C. § 1395dd(b)(1)(A). Illegal procedures, like an abortion prohibited by state law, or abortions for which physicians and hospitals have the right to object to performing, are not "available" as stabilizing treatment.

134.  The Weldon Amendment to annual appropriations laws prohibits federal agencies from discriminating against any institutional or individual health care entity "on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." *See, e.g.*, Consolidated Appropriations Act § 507(d)(1).

135. The Coats-Snowe Amendment prohibits "[t]he Federal Government" from discriminating against any healthcare entity on the basis that it refuses to perform induced abortions or to provide referrals for such abortions. 42 U.S.C. § 238n.

136. The Mandate violates the Weldon and Coats-Snowe Amendments.

137. The Religious Freedom Restoration Act (RFRA) prohibits Defendants from imposing a substantial burden on religious exercise unless doing so is the least restrictive means of advancing a compelling government interest. 42 U.S.C. § 2000bb-1.

138. The Mandate violates RFRA.

139. The Free Exercise Clause of the First Amendment prohibits Defendants from compelling physicians to participate in, refer for, or otherwise facilitate abortions in violation of their religious beliefs.

140. The Mandate violates the Free Exercise Clause.

141. No other federal law authorizes the Mandate.

142. Because the Mandate contradicts EMTALA's text and other laws, and exceeds the agency's statutory and constitutional authority, it must be held unlawful and set aside.

## COUNT II
## Administrative Procedure Act: Without Required Procedure
### 5 U.S.C. § 706(2)(D)

143. Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1–121 of this complaint.

144. The Court shall hold unlawful and set aside agency action undertaken without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

145. The Medicare Act requires that the agency conduct notice and comment before issuing any rule, requirement, or statement of policy that changes a

substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits. 42 U.S.C. § 1395hh(a)(2), (b).

146.    The Mandate is a rule, a requirement, and a statement of policy that changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under the Medicare Act.

147.    The APA requires notice and comment for a legislative or substantive rule.

148.    The Mandate is a legislative or substantive rule.

149.    The APA requires the Court to hold unlawful and set aside any action an agency undertook without procedure required by law.

150.    The agency failed to conduct notice and comment before issuing the Mandate, which was a procedure required by the Medicare Act and the APA.

151.    Because Defendants acted without observance of the procedure required by law in issuing the Mandate, it must be held unlawful and set aside.

## COUNT III
### Administrative Procedure Act:
### Arbitrary, Capricious, and Abuse of Discretion
### 5 U.S.C. § 706(2)(A)

152.    Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1–121 of this complaint.

153.    The Court shall hold unlawful and set aside agency action undertaken in a way that is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A).

154.    When issuing the Mandate, the agency entirely failed to consider or even discuss important aspects of the problem, rendering it arbitrary and capricious.

155. Defendants failed to consider how the Mandate interacts and conflicts with conscience protections for individual physicians and entities.

156. Defendants failed to consider how the Mandate conflicts with the religious liberty interests of Medicare providers, including their rights under RFRA and the First Amendment's Free Exercise Clause.

157. Defendants failed to consider the limits on Congress' spending power, including the legal principles limiting conditional spending and providing that conditions on federal spending do not preempt state law.

158. Defendants failed to consider that the Social Security Act and EMTALA have anti-preemption clauses precluding the Mandate.

159. Defendants failed to consider that the Social Security Act does not regulate the practice of medicine and EMTALA does not authorize any federal agency to establish a standard of care by requiring abortions.

160. Defendants failed to consider that the Mandate conflicts with the Hyde and Weldon Amendments which prevent the use of federal funds to facilitate abortion and prevent imposing federal penalties on doctors hospitals and doctors because they decline to facilitate abortions.

161. Defendants failed to consider the reliance interests of hospitals and physicians who have practiced under EMTALA for decades without the Mandate.

162. The Mandate does not acknowledge the agency's change in position from never having previously required abortions or violations of state law under EMTALA, and as a result failed to explain that change in position.

163. Defendants offered no reasoned explanation for how EMTALA can require abortions when EMTALA requires stabilizing the "unborn child."

164. Defendants discussed no alternative approaches.

165. Because the Mandate is arbitrary, capricious, and an abuse of discretion under the APA, it must be held unlawful and set aside.

## COUNT IV
## Religious Freedom Restoration Act
## 42 U.S.C. § 2000bb-1

166.    Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1–121 of this complaint.

167.    RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the government proves that the burden is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1.

168.    CMA asserts the rights of its members under RFRA.

169.    CMA's members exercise their religious beliefs in practicing medicine by caring for patients generally, and in caring for patients in situations subject to EMTALA. CMA's members exercise their religious beliefs in treating pregnant women and their unborn children with respect and dignity, and in opposing involvement in the direct and intentional killing of unborn children in abortion.

170.    The Mandate substantially burdens the exercise of CMA's members' sincerely held religious beliefs.

171.    The Mandate imposes significant pressure on CMA's members to practice medicine in way that would violate their beliefs because of the threat of investigations, fines, and other punishments and impairments.

172.    The Mandate is not supported by a compelling government interest and is not the least restrictive means of advancing such an interest.

173.    Upon information and belief, the Mandate specifically and primarily burdens religious conduct, favors some religious beliefs over others, and is motivated by animus and hostility towards the religious beliefs of pro-life physicians and hospitals.

174. The Mandate, and Defendants' enforcement thereof, violate the rights of CMA's members under RFRA.

## COUNT V
## Free Exercise Clause of the
## First Amendment

175. Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1–121 of this complaint.

176. Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof …." U.S. Const. amend. I.

177. CMA asserts the rights of its members under the Free Exercise Clause.

178. The First Amendment protects CMA members in their exercise of religion from the actions of Defendants in issuing and enforcing the Mandate.

179. CMA's members exercise their religious beliefs in practicing medicine by caring for patients generally, and in caring for patients in situations subject to EMTALA. CMA's members exercise their religious beliefs in treating pregnant women and their unborn children with respect and dignity, and in opposing involvement in the direct and intentional killing of unborn children in abortion.

180. The Mandate substantially burdens the exercise of CMA's members' sincerely held religious beliefs.

181. The Mandate exerts significant pressure on CMA's members to violate their beliefs in order to keep providing healthcare in federally funded health programs and activities or else face exclusion from those programs, loss of funding, loss of livelihood, and fines, investigations, and other punishments.

182. The Mandate is not neutral or generally applicable.

183.   The Mandate affords discretion to enforcement officials to decide when an offense has occurred and whether and how to apply investigations or punishments.

184.   Upon information and belief, the Mandate specifically and primarily burdens religious conduct, favors some religious beliefs over others, and is motivated by animus and hostility towards the religious beliefs of pro-life physicians and hospitals.

185.   The Mandate is not supported by a compelling government interest and is not the least restrictive means of advancing such an interest.

186.   The Mandate, and Defendants' enforcement thereof, violates the rights of CMA's members under the Free Exercise Clause of the First Amendment.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that the Court:

A.   Hold the Mandate unlawful, set it aside, and vacate it. 5 U.S.C. § 706(2).

B.   Declare the Mandate and Defendants' actions to enforce the Mandate to be unlawful. 28 U.S.C. § 2201.

C.   Issue an injunction prohibiting Defendants from enforcing the Mandate.

D.   Award Plaintiff its costs and reasonable attorney's fees.

E.   Award any other relief that is equitable and just.

Respectfully submitted this 10th day of January, 2025.

*/s/ Jonathan A. Scruggs*

**Jonathan A. Scruggs**
TBPR No. 025679 (admitted 11/13/2006)
AZ Bar No. 030505
**Alliance Defending Freedom**
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: 480-444-0020
Facsimile: 480-444-0028
jscruggs@ADFlegal.org

*Counsel for Plaintiff*

28