# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **CATHOLIC MEDICAL ASSOCIATION**, on behalf of itself and its members, | |
| Plaintiff, | Civil Action No. 3:25-cv-00048 |
| v. | Judge Campbell<br>Magistrate Judge Frensley |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **ROBERT F. KENNEDY JR.**, in his official capacity as Secretary of Health and Human Services; **CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)**; **MEHMET OZ**, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services, | |
| Defendants. | |

## DECLARATION OF DR. CHRISTINE PETRIN

I, Christine Petrin, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Christine Petrin. I am over eighteen years old, of sound mind, and fully competent to make this declaration. The statements contained herein are based on my personal knowledge, medical training and experience, and information I have gained through my leadership roles in Doctors for America ("DFA"). I provide this declaration in support of the motion to intervene.

2. I am a primary care physician at a community health center and a Clinical Instructor of Internal Medicine & Pediatrics at Mount Sinai Hospital, both in New York City.

1

My driving mission as a physician is to improve the lives of children, adults, and their communities.

3. I received my medical degree from Tulane University School of Medicine in New Orleans, Louisiana. I completed a dual medical residency in Internal Medicine and Pediatrics at MedStar Georgetown University Hospital, in Washington, D.C., where I was the Chief Resident.

4. Since February 2024, I have served as the President and Chair of the Board of DFA. I previously served as both Vice Chair and Secretary of the Board and have been a member of DFA since 2018.

DFA and its Members

5. DFA is a nonprofit organization organized under Section 501(c)(3) of the Internal Revenue Code. Founded in 2009, DFA works on behalf of its members to improve the health of patients, communities, and the nation. One of our guiding principles is that clinicians must take a leading role in improving health care and ending health disparities, and we provide our members with the tools to do so. We advocate on our members' behalf for policies that allow them to provide equitable and accessible care to patients.

6. DFA is comprised of more than 27,000 medical professionals, medical students, and health care advocates who live in all fifty states and the District of Columbia, work in various practice settings, including in hospitals, academia, and in private practice, and represent all areas of specialization, including Emergency Medicine, Family Medicine, Obstetrics and Gynecology ("OB/GYN"), and Maternal-Fetal Medicine ("MFM").

7. DFA members have access to various DFA resources, including continuing medical education and other training, events, and advocacy tools. DFA also drafts resources to keep our members up to date on the latest developments in health policy.

8. DFA members, including myself, serve in various capacities in the organization, including on the Board of Directors, and drive our organizational focus areas: health justice and equity; access to affordable care; and community health and prevention. In each of these buckets, DFA provides education and training to its members and engages in advocacy at the state and federal levels. Through these efforts, we work to improve outcomes for the patients we serve.

## DFA Members and EMTALA

9. Some DFA members provide care in Medicare-participating hospitals with emergency departments and are subject to the requirements of the Emergency Medical Treatment and Labor Act ("EMTALA"). As professionals who are required to comply with EMTALA, these DFA members are impacted by any changes to that law, which clinicians have relied on for decades.

10. Those DFA members who practice in hospitals covered by EMTALA are required to provide stabilizing treatment to patients with "emergency medical conditions," as defined by EMTALA. Emergency medical conditions include medical conditions that place the health of the patient in "serious jeopardy" or risk serious impairment of bodily functions. 42 U.S.C. § 1395dd(e)(1).

11. Based on my medical knowledge and training, I understand there to be certain serious pregnancy complications that can rise to the level of an emergency medical condition and can only be stabilized with abortion care, as EMTALA uses those terms. Those conditions include ectopic pregnancies, previable preterm premature rupture of membranes (PPROM), and preeclampsia. These conditions could require abortion as a stabilizing treatment if they occur at a point when the embryo or fetus cannot survive outside the uterus.

12. It is my understanding that this is why abortion is a required treatment under EMTALA—like providing oxygen, initial wound care, or antibiotics for sepsis, it meets the definition of a stabilizing treatment for emergency medical conditions related to pregnancy.

13. Some of DFA's members work in hospitals covered by EMTALA in states where access to abortion care is restricted. Some DFA members live in states with abortion bans that include exceptions to allow for abortion care when the health of the pregnant person is at risk, but clinicians often face uncertainty as to when those exceptions may apply. Still other members live in states that allow abortion care only when the life of the pregnant person is at risk, with no exception for when the health of the pregnant person is threatened, even in emergencies.

14. Clinicians in these states, including our members, may face criminal penalties if the care they provide falls on the wrong side of those lines.

15. It is my understanding that, if not for EMTALA, the ability of DFA members and other clinicians in states with certain abortion restrictions to provide necessary care to patients experiencing emergency medical conditions, including severe pregnancy complications, could be impeded, delayed, or denied altogether because of these state laws.

16. For example, I have spoken with a DFA member who is an OB/GYN practicing at a critical access hospital covered by EMTALA in a state that bans abortion with no exception for the health of the pregnant patient. This member has informed me that she provides stabilizing care to pregnant patients with emergency medical conditions, including abortions where consistent with the standard of care. If EMTALA did not preempt her state's abortion ban, she understands the state abortion ban to require her to stand by and withhold health- and life-saving abortion care from pregnant patients, or face criminal and civil penalties. Withholding abortion care in these scenarios could lead to potentially irreversible, and even fatal, consequences for her

4

pregnant patients. She informed me that it is essential for her practice as a physician to provide such abortions, consistent with the standard of care and the physician-patient relationship.

17. Because of EMTALA, physicians and hospitals can and must continue to provide this care regardless of more restrictive state laws. Without these protections, clinicians in states with restrictions will be forced to choose between providing their patients life- and health-saving medical care and risking criminal prosecution or declining to provide care and forcing their patients to wait to become sicker before they can obtain care or to travel great distance to receive care, further jeopardizing their health. Some patients may not be able to receive care at all, and some patients may not receive care until it is too late to prevent lifelong health consequences, such as the loss of fertility or death.

18. I have read the complaint filed by the Plaintiff in this case. I understand that the Plaintiff is arguing that EMTALA does not protect pregnant patients who need stabilizing abortion care, but it does obligate physicians to "stabilize" the "unborn child." Compl. ¶ 126.

19. Based on my medical training and experience, it is my opinion that such a requirement would essentially make it impossible to provide emergency abortion care when necessary to stabilize the *pregnant* patient. Abortion results in fetal or embryonic demise, by definition. So, if physicians are obligated to stabilize the embryo or fetus, they cannot perform a procedure that would result in its demise--even if that is the indicated treatment to stabilize, and preserve the health and life of the pregnant patient. This is contrary to the training and experience of clinicians, who are trained to make clinical assessments to provide the best care for their pregnant patients.

20. DFA and its members oppose any effort to restrict or interfere with the ability of clinicians to provide needed stabilizing care to patients experiencing emergency medical conditions.

Executed on May 29, 2025

                                                                */s/ Christine Petrin*

                                                                Dr. Christine Petrin